## PETERSON v. BULLION BECK AND CHAMPION MINING COMPANY.

### No. 2269.   Decided July 30, 1912 (126 Pac. 310).

1. TRIAL—DIRECTED VERDICT.   The propriety of directing a verdict for defendant is tested by the question whether all reasonable men would draw the same conclusions from the evidence, and whether that conclusion requires a verdict for defendant. (Page 365.)

2. MINES AND MINERALS—LEASES—INTERFERENCE WITH OPERATIONS —JURY QUESTIONS.   In an action by a lessee of a block of mining ground for damages in being prevented from operating under his lease through defendant lessors working the block immediately above, causing the ground to cave and cover up plaintiff's ore, whether the caving was caused by defendant's act, and whether the working of the upper block was necessarily a nuisance and an interference with plaintiff's operations, *held*, under the evidence, jury questions.   (Page 366.)

APPEAL from District Court, Fifth District; *Hon. Joshua Greenwood,* Judge.

Action by Lars C. Peterson against the Bullion Beck and Champion Mining Company.

Judgment for defendant.   Plaintiff appeals.

REVERSED AND REMANDED FOR NEW TRIAL.

*Geo. W. Udall, Hanson & Carlson* and *E. A. Walton* for appellant.

*P. T. Farnsworth* and *Howat & MacMillan* for respondent.

RITCHIE, District Judge.

This case has been before this court on a former appeal. (33 Utah, 20, 91 Pac. 1095, 14 Ann. Cas. 1122.) On the first trial the plaintiff alleged that he leased a block of mining

ground from the defendant, and that afterwards the defendant, by working the block of ground immediately above his, caved in the ground, covering up the plaintiff's ore and preventing him from carrying on operations under his lease. The defendant answered, denying any wrongful acts to the injury of the plaintiff, and alleging that the block of ground above the plaintiff's was in the sole and exclusive possession of one Malvey, as lessee, and that the alleged wrongful caving of the ground was done by Malvey on his own responsibility, without the knowledge of the defendant, or any authority from it or connivance on its part. The second trial was upon an amended complaint in the same language as the original complaint, except that there was added a paragraph alleging that the block above the plaintiff's ground was in the possession of the defendant when the plaintiff's lease was made, and that the conditions were such that the working of the upper block and any use thereof would necessarily interfere with the plaintiff's ground, and that the injuries sustained were caused necessarily and directly by working the ground above. The defendant's answer to this complaint omitted the affirmative allegation with reference to Malvey's possession contained in the first answer and, so far as the pleading was concerned, ignored that issue altogether. It is true that the defendant on the second trial sought to sustain by the evidence the defense that the acts of Malvey, and not of the defendant, caused the caving in of the ground of which the plaintiff complains.

The reversal of the former judgment was on two assignments of error only, the giving of an instruction and the refusal of a request for instruction. The trial court was upheld in three other particulars in giving and refusing requests for instruction. On the second trial the case did not reach that stage. The plaintiff now complains that the court erred in directing a verdict for the defendant.

The only question then is: Would all reasonable men draw the same conclusion from the evidence, and would that conclusion require a verdict for the defendant?

The principal question of fact in controversy was whether the caving in of the block of ground above the plaintiff's was caused by the act of the defendant, and whether the working of the upper block was necessarily a nuisance to the plaintiff, and such that any work therein would necessarily interfere with the plaintiff working his own ground.

Robert Martin, a witness, testified, among other things, in substance as follows:

"Malvey and these other fellows were cutting, blasting and drilling. . . . It caved three or four different times. It dropped off the upper portion of the pillar at the north side of the stope on the south side of the pillar, and it started to spring the posts and the caps, and finally broke them and let them down. At the first cave there was about fifteen or sixteen tons came down. . . . A little waste came down every day, kind of drizzled down. There was rocks came down every day."

Nephi Griffiths testified:

"The cause of this caving of block 9—300 south was the working of the upper block of ground. Peterson did his full duty in keeping a line of timbers in his place. . . . Malvey did not work up in a good miner-like manner. I think that the improper working of the upper block of ground was the cause of the caving. . . . Malvey didn't timber it at all. I don't think timber would have done any good there. . . . It would be a hard proposition to hold the ground up. There was so much loose ground about. At any time you work out that ground there, you could not get in timber enough to hold it. . . . It is impossible to work without caving the ground. . . . I don't think there would have been a cave if Malvey had not taken out that pillar. The working on that pillar and the blasting they done caused the caving in. Malvey shot out the stulls, and as a result of shooting them out the whole thing came down. . . . It looked to me like they were trying to cave it. There is no doubt in my mind of that. . . . The cave would have occurred without Malvey working out a spite

against Peterson. I know that Malvey wanted to cave in the stope so that he could get all their ores without timbering. Earls (the superintendent) gave them permission to blast up there and dump that down and fill this stope."

Lars C. Peterson, the plaintiff, testified:

"It was not possible for a miner to work the ore out of that stope above the 200 level while another was working below the 200 level. He could have done it with less damage if he had been careful. They could not help but cave this stope down. Earls told Malvey to go up and take this pillar out, and he took this out. . . . Told him to take this ore out and blast it down. That was the ore above the 200 level; it was about eight or nine feet above the level. . . . Malvey blasted on the sides and knocked the whole business down on my timbers. The effect of the mining above me was to cause all the waste to come down on my waste."

On cross-examination he testified:

"A few days after Malvey went in there, he started to shoot down that timber and shoot down that waste on me. Malvey let all that roof down on me. He couldn't help himself. . . . Before that he shot rocks down all the time, and Mr. Earls stood right there and saw. I could have taken all my ore out if Malvey hadn't shot that material down on me."

Thomas Griffiths and Nephi Griffiths, miners familiar with the situation, testified to facts substantially the same. From these facts it is contended that three different theories may be drawn: (1) That the block above the plaintiff's could have been worked by the tenant thereof without causing damage to the plaintiff, had ordinary care been used; (2) that the working of the block above necessarily caused a nuisance and injury to the plaintiff from the tenant's ordinary use of the premises, working in a careful, workmanlike manner; and (3) that Malvey, the tenant of the block above, maliciously worked his block in the manner he did with the intent to injure the plaintiff's property to make it impossible for the plaintiff to work it, and to drive him out of it.

From the portions of the evidence quoted, it would seem that all of these theories had some evidence tending to support them; and it became a question of the greater credibility of one portion of the evidence as compared with another as to which theory was supported by the evidence, and that it could not be said that all reasonable men would come to the same conclusion, and therefore that it could not be said, as a matter of law, that the defendant was entitled to a verdict. The conclusion seems irresistible that the evidence should have been submitted to the jury.

This conclusion is not inconsistent with the former opinion, but is in accord with it. The case on the former trial was rightfully given to the jury, and the charge of the court then given was in the main correct. In only two particulars did this court find it necessary to disagree with the trial court in the views expressed during the course of the trial. Upon the second trial the court should have proceeded as before and submitted the case to the jury, making such modifications in its charge as were pointed out in the former opinion.

The judgment must be reversed and a new trial granted. It is so ordered. Costs to appellant.

FRICK, C. J., and McCARTY, J., concur.